**RECEIVED**

SEP 2 4 2010 ᏟᎢᏅ

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

ANGELA LEE WARREN FOSTER, ET AL          CIVIL ACTION NO. 08-1170

VERSUS                                   JUDGE DOHERTY

UNITED OF OMAHA LIFE INS. CO.            MAGISTRATE JUDGE HILL

### MEMORANDUM RULING

This matter involves a claim for life insurance proceeds, brought by Angela Lee Warren Foster (individually and as Trustee of the Eleanor F. Warren Family Trust), Shonda Faye Warren Laborde, Windy Warren Darby and George W. Warren, Jr. Against United of Omaha Life Insurance Company ("United"). The parties have submitted this case for trial on the briefs and evidence. [Doc. 37] Having considered the record, the evidence and the memoranda of counsel, the Court finds in favor of the plaintiffs, in all respects with the exception of their claim for statutory penalties, and against defendant for the following reasons:

### Factual Background

Plaintiffs are the sole principal and income beneficiaries of the Eleanor F. Warren Family Trust ("the Trust"). The Trust was formed by Eleanor F. Warren ("Mrs. Warren"), on June 25, 2001, and during all relevant time periods, Angela Lee Warren Foster ("Ms. Foster") has served as Trustee. After establishment of the Trust, the Trust purchased a life insurance policy from Northwestern Mutual, which provided $1,000,000.00 of insurance benefits to be paid to the Trust upon the death of Mrs. Warren. [Docs. 22-1, ¶¶ 1-2; 29-1, ¶¶ 1-2]

In the spring of 2005, George W. Warren, Jr. (a plaintiff herein), David Smith (an insurance agent with the Smith Insurance Agency in Houma, Louisiana), and Brandon Smith (David Smith's son

and an employee of the Smith Agency) met to discuss the group insurance coverages for B.W.B Controls, Inc., a company owned by the Warren family and headquartered in Houma, Louisiana. David Smith had been the company's insurance agent since the early 1980's. [Docs. 22-1, ¶ 3; 29-1, ¶ 3; 22-4, pp.4-5] During the meeting, David Smith inquired as to whether there was any kind of buy/sell agreement in place involving the Trust. [Doc. 22-4, p.5] Mr. Warren advised Mr. Smith there was a buy/sell agreement, and it was funded with the term life insurance policy through Northwestern Mutual. [Id.] Mr. Smith then advised Mr. Warren that because his agency quoted approximately twenty different term life insurance carriers, he might be able to obtain a policy with a lower premium. [Id.; Docs. 22-1, ¶ 3; 29-1, ¶ 3] Mr. Warren agreed to have the Smith agency obtain quotes for a replacement policy. [Docs. 22-4, p.5; 22-1, ¶ 4; 29-1, ¶ 4]

On June 20, 2005 (after obtaining quotes from several life insurance companies), the Trust submitted a formal application for a replacement policy with Banner Life Insurance Company ("Banner"). Banner offered the Trust a $1,000,000 policy with an annual premium of $6,830.00. The quote from Banner was a rated table B premium (*i.e.* higher than a standard rate), due to abnormal EKG and blood test results, with both test having been performed at Banner's request during the underwriting process. [Docs. 22-1, ¶¶ 4-5; 29-1, ¶¶ 4-5]

In search of a better premium, the Smith agency went back to market in an attempt to find a company that would offer a policy with the same rating, but with lower premiums than Banner. [Doc. 22-4, p.10] Eventually, the Smith Agency and the Trust decided to apply with United, and sometime in late September or early October of 2005, Brandon Smith began the application process for the United policy. [Docs. 22-1, ¶¶ 5-6; 29-1, ¶¶ 5-6] With the help of his coworker Jessica Breaux, Mr. Smith completed the first several pages of the United application, including the medical history

-2-

section, by using the information contained in the previous Banner application.[1] [Docs. 22-1, ¶ 6; 29-

---

[1]United argues that although Mr. Smith completed the application on behalf of Mrs. Warren by using the answers she had provided to Banner, he "went over each question in the United of Omaha application with Ms. Warren over the telephone and she provided the very same answers." [Doc. 29-1, ¶ 6] In support of its position, United relies upon Mr. Smith's deposition testimony, wherein he is asked by counsel for United whether he "read the application [and his answers] to her over the phone" and whether he "asked her if that information was correct," to which Mr. Smith responded, "Yes." [Doc. 29-2, pp.2-3]. However, as plaintiffs point out, earlier in his deposition, while being questioned by counsel for plaintiffs, Mr. Smith testified he could not remember whether or not he reviewed the medical information with Mrs. Warren prior to submission of the application to United:

| Q | Did you have to, while you were preparing this [United application], did you have to call Mrs. Warren or anyone else to get any additional information? |
| A | Possibly so. |
| Q | Do you recall as you sit here today actually talking with anyone, either Mrs. Warren or Angela Warren, about the responses to the questions on page three [*i.e.* the medical history section]? |
| A | I don't recall. I do know that I called her for a few things. The medical questions would not have been – we just would have taken these checks here, yes or no, and then used the medical that the actual paramed exam to be accompanied with this in the most detail [sic]. |
| Q | So any of the calls that you would have had with Mrs. Warren or Angela, her daughter, regarding the United application as you sit here today, is it your testimony that those conversations did not involve any medical questions? |
| A | I mean, not every single one. But maybe – I don't recall exactly which, if any. |
| Q | Okay. |
| A | You know, if it would have been, it would like, "You're taking Lexapro. How many milligrams?" But then again, it's all listed on the paramed exam there. So it was – I don't recall exactly which questions were asked or the detail which each question was asked. |
| Q | Okay. |
| A | I know that it was a copy of the Banner application. |
| Q | Wait. I'm sorry? |
| A | It was copied from that Banner application that was approved. Table B, non-smoker. |

[Doc. 22-4, p.13] Plaintiffs further note that although Mr. Smith testified his phone conversation with Mrs. Warren took place before Jessica Breaux sent the signature pages to Mrs. Warren on October 5, 2005, and that he called Mrs. Warren from his office telephone, the telephone records of the Smith agency (obtained by plaintiffs by subpoena), show no calls of sufficient duration were made from Mr. Smith's office to Mrs. Warren's home during the relevant time period.[Doc. 22-4, pp. 158-59, and Doc. 22-5, pp. 4-5]

The Court additionally notes that according to Mr. Smith, the answers contained in the medical portion of the Banner application were filled in by a nurse who examined Mrs. Foster on behalf of Banner; in other words, it was not Mrs. Foster herself who wrote down the answers on the Banner application, nor was it Mrs. Foster who wrote the answers on the United application. [Doc. 22-2, ¶ 13;

1, ¶¶ 5-6]  Both the Banner and United applications listed only Dr. Sydney Crackower and Dr. Eugene

Steuben as Mrs. Warren's physicians. [Doc 23-1, ¶ 5]  The medical history section of the United

application included a question which asked:

> Have you ever (a) received care or treatment for, or (b) been advised by a physician or
> health care provider to seek care or treatment for, or (c) consulted with a health care
> provider regarding . . . [a]ny disease of the lungs or respiratory system, including
> tuberculosis, asthma, chronic bronchitis, emphysema or shortness of breath?

[Doc. 22-7, p.3]  Mr. Smith checked the "no" box in response to this question.[2]  [Doc 22-7, p.3]

On October 5, 2005, Jessica Breaux sent to Mrs. Warren only those pages of the application

requiring a signature (which did not include the medical history section), requesting that Mrs. Warren

sign the documents, and that Angela Foster also sign the documents on behalf of the Trust, as the Trust

was the owner and applicant for the policy. [Docs. 22-1, ¶ 7; 29-1, ¶ 7]  The Smith Agency received

the signed pages on or about October 25, 2005.  [Docs. 22-1, ¶ 10; 29-1, ¶ 10]  The entire application

was then forwarded to United's underwriting office in Omaha, Nebraska, where it was received on

October 26, 2005.[3]  [Id.]

---

Doc. 22-4, pp. 7-8]

[2]The question contained in the Banner application, upon which Mr. Smith relied when he filled
out the United application, was a narrower question than that posed by United.  Specifically, the Banner
application asked: "3.  Within the past 10 years, have you been treated or diagnosed by a member of the
medical profession as having: . . . asthma, pleurisy, bronchitis, emphysema, tuberculosis, spitting blood,
or chronic cough?" [Doc. 23-3] Accordingly, the United question was broader, in that it was not limited
to a ten year time period, and it asked about "any disease of the lungs or respiratory system," as well as
shortness of breath.  As previously noted, the answers contained in the medical portion of the Banner
application were filled in by the paramed who examined Mrs. Foster on behalf of Banner. [Doc. 22-2, ¶
13; Doc. 22-4, pp. 7-8]

[3]At some point after United had approved the original $1,000,000 life insurance policy, but prior
to delivery, David Smith contacted the Warren family and advised them they could increase the policy
amount to $2,000,000, and the premiums would remain close to those paid under the prior Northwestern
policy. [Doc. 22-4, pp.15-16] The Warren family agreed, and on November 23, 2005, United approved an
increased face amount of $2,000,000.00. [Docs. 22-2, ¶ 22; 23-1, ¶ 13; 26-1, ¶ 13]

Soon after the application arrived at United's underwriting office, United received a report from the MIB Group ("MIB").[4] [Docs. 22-1, ¶11; 29-1, ¶ 11] MIB is a non-profit membership organization of life insurance companies (including United), which exchanges information about applicants to its member insurers. The United application authorized United to obtain Mrs. Warren's complete medical history from MIB.[5]  The coded report from MIB indicated Mrs. Warren suffered from anxiety, hypertension, abnormal EKG and chronic obstructive pulmonary disease ("COPD").[6] [Docs. 22-2, ¶ 14; 29-1, ¶ 14] "The COPD code on the MIB report indicated that the information had been reported to MIB by another member life insurer in August 2001 (which was, incidentally, when the 'soon to be replaced' Northwestern mutual policy was underwritten) and that information had been acquired by the reporting life insurer from the records of an attending physician within the past year - or within a year of August 2001."[7] [Docs. 22-2, ¶ 15; 29-1, ¶ 15] "According to the rules of MIB, because the application submitted by the Trust did not include a history of a lung disease, United was required to perform its own investigation in an attempt to confirm the information contained in the MIB report before it could request the information from the MIB." [Docs. 22-1, ¶ 16; 29-1 ¶ 16]

---

[4]The parties have not provided the precise date upon which the MIB report was received. However, it was shortly after October 26, 2005 (the day United received the application), but before December 7, 2005 (the day the policy was delivered to Mrs. Foster). [*See e.g.* Doc. 22-6, p. 9]

[5]According to the parties' stipulated facts, "The United application actually authorized United to obtain Mrs. Warren's personal information from MIB, which would include all health information, complete medical history, including mental and physical condition, prescription drug records, drug and alcohol use and other information such as finances, occupation and insurance claims information which may be on file with the MIB." [Docs. 22-1, ¶ 11; 29-1, ¶ 11]

[6]The code for COPD ("418GZN") is actually a descriptor for one of several potential lung impairments, including chronic bronchitis, emphysema or even cystic fibrosis. [Docs. 22-2, ¶ 14; 29-1, ¶ 14]

[7]After Mrs. Warren's death and during United's investigation of the claim, it was determined the code referencing COPD in the MIB report was the result of Mrs. Warren's treatment with a Dr. Stephen Silas which began in either 1999 or 2000 and ended in 2001. [Docs. 23-1, ¶ 21; 23-2, p.19; 33-2, p.5]

On October 31, 2005 (six days after Mrs. Foster returned the pages of the application requiring her signature, and five days after United received the entire, signed application), Mrs. Warren saw Dr. Fadi Malek for the first time. [Docs. 22-2, ¶36; 23-1, ¶ 8]  During her examination, Mrs. Warren reported she was experiencing shortness of breath when she engaged in various activities, and she wheezed on exertion. [Doc. 23-5]  She underwent chest x-rays, sinus x-rays, lab work, spirometry evaluation tests, lung volume tests, and oxygen saturation tests. [Id.]  Dr. Malek prescribed Spiriva, Advair, a Porventil inhaler, portable oxygen, and he administered a pneumococcal injection. [Id.]  On November 3rd, 2005, Mrs. Warren was given another pneumococcal injection by Dr. Fei, Dr. Malek's partner. [Id.]

According to defendant:

On November 1, 2005, as part of United of Omaha's application investigation, the insurance broker, Brandon Smith, was instructed to contact Ms. Warren and have her confirm 'the name and phone number of any other physician consulted in the last 5 years and why did she go see them?  What were the findings from the doctor?  What was the treatment given?'  The next day on November 2, 2005, Brandon Smith called Ms. Warren who stated that, other than Dr. Crackower, she had not seen or been treated by any other physicians in the past five (5) years.

[Doc. 23-1, ¶ 10]  An email sent to United by Jessica Breaux that same day reads, "No other physician's [sic] in the past 5 years per Brandon."[8] [Doc. 23-7, p.2]

On November 18, 2005, an employee of United interviewed Mrs. Warren over the telephone

_____

[8]Plaintiffs dispute these statements of fact, stating as follows:

Plaintiffs dispute these statements of fact because United and Brandon Smith already knew that Mrs. Warren had seen at least one (1) other doctor in the past five (5) years and had a few surgeries.  Therefore, it is unknown why Mr. Smith would have reported "no other physicians" to Diversified Underwriters when everyone knew that statement was not true.

[Doc. 26-1, ¶ 10] As noted, both the Banner and United applications listed Drs. Crackower and Steuben as Mrs. Warren's physicians. [Doc. 23-1, ¶ 5]

as part of United's underwriting process.[9] [Docs. 23-1, ¶ 12; 26-1, ¶ 12]  Mrs. Warren was not asked whether she had ever been diagnosed with, or received treatment for COPD during the interview,  nor was she asked about shortness of breath or wheezing, nor did Mrs. Warren volunteer that information.[10] [Docs. 23-8; 23-1, ¶ 12, and Doc. 26-1, ¶ 12]

On November 30, 2005, Mrs. Warren saw Dr. Malek again. [Docs. 23-1, ¶ 14; 26-1, ¶ 14]  Her medical records show she was still complaining of shortness of breath. [Doc. 23-5, p.7]  Dr. Malek scheduled an appointment for Mrs. Warren with Dr. Mounir on December 6, 2005 (the day before the policy was delivered to Mrs. Warren), to investigate her cardiac status.  [Id.] At her appointment, Dr. Mounir scheduled various tests.  The tests were not administered until after delivery of the policy to Mrs. Warren. [Docs. 23-1, ¶ 15; 23-9; 26-1, ¶ 15] [11]

_____

[9]At the deposition of Jerry Bender, defendant's "Risk Selection Director," he testified at the time of the interview, "the underwriter [Denise Stephens] had already made a decision to issue the policy -- the original decision to issue the million." [Doc. 22-8, p.7] The interview was conducted due to a request to increase the face amount of the policy from $1,000,000 to 2,000,000 during the underwriting process, at the suggestion of David Smith. [Id. at 7 ("And we don't get a -- typically get a telephone interview until an application is over a million dollars.  So when they came back and asked for 2 million, that's when the interview was done, and it was -- it was done routinely just to satisfy that last requirement.")]

[10]Plaintiffs' statement of uncontested fact on this issue reads as follows: "A telephone interview was conducted with Mrs. Warren by a United representative on November 18, 2005.  At no time during the interview was Mrs. Warren asked if she had received any treatment or been diagnosed with COPD." [Doc. 22-2, ¶ 18]  Defendant's response is as follows: "Contested. Ms. Warren was asked if [sic] to identify any doctors from whom she was receiving any prescriptions and she failed to identify Drs. Malek and Fei whom she was being treated by at the time for shortness of breath, wheezing, and exertion." [Doc. 29-1, p.3] This Court notes a review of the transcript of the telephone interview reveals the questions posed to Mrs. Warren were not nearly as clear or explicit as defense counsel implies.  In fact, the interview appears rather perfunctory, and more in the nature of that described by Jerry Bender, defendant's Risk Selection Director - a routine requirement triggered when an application for life insurance is over one million dollars.  The interview appears to be of little use as an investigative tool. [See Doc. 22-10] A copy of the transcript of the interview is attached to this Ruling as Court Ex. A.

[11]The tests (administered after delivery of the policy) included an electrocardiogram, a carotid ultrasound and a calcium score. [Docs. 23-9]  On the basis of the forgoing tests, Dr. Mounir made the following observations: Ms. Warren was in the greater than 90th percentile range for cardiovascular disease; moderate carotid disease bilateral; severe left ventricular hypertrophy; 40-50% stenosis of the right and 50-60% stenosis of the left carotid arteries; calcium score suggested moderate plaque development. Plaintiffs have submitted the affidavit of Dr. Mounir, dated October 28, 2009, wherein he

On December 7, 2005, Brandon Smith met with Mrs. Warren for lunch in order to deliver the

policy and collect the initial $13,340.00 premium payment. [Docs. 22-2, ¶ 23; 29-1, ¶ 23; 23-1, ¶ 16;

26-1, ¶ 16] During his deposition, Mr. Smith testified he reviewed every page of the policy with Mrs.

Warren, which included the application, as it was bound with the policy. [Doc. 23-14] Mr. Smith

further testified at the lunch meeting, he asked Mrs. Warren whether she had experienced any change

in health or seen any doctors since she first submitted her application to United. [Docs. 23-1, ¶ 17; 26-

1, ¶ 17] Mr. Smith further testified Mrs. Warren answered "No" to both questions. [Id.] Mr. Smith

also testified he presented to Mrs. Warren a document with the heading, "Delivery Requirement,"

which all parties (and the Court) refer to as an "Addendum" to the insurance contract. [Doc. 23-10]

This document required the insured (and arguably the owner of the policy - *i.e.* the Trust) to affirm

she had neither experienced any change in her health, nor seen any other doctors during the application

period. [Id.] Mrs. Warren signed the addendum[12]; the signature line for the "Eleanor Warren Family

Trust" is blank.[13] [Docs. 22-2, ¶ 27; 23-1, ¶ 16]

After the policy was delivered to Mrs. Warren on December 7, 2005, the only other contact

between the Warrens and United was to submit a premium payment at the end of 2006. [Docs. 22-2,

---

testifies he had recently been provided with a copy of an earlier EKG for Mrs. Warren, which had been
administered by another doctor, and that "the results of [his] EKG on December 21, 2005 shows [sic] no
change from her earlier EKG on May 27, 2005." [Doc. 26-5] Dr. Mounir concludes, "From the May 27,
2005 EKG to the December 21, 2005 EKG, Mrs. Warren did not have any heart attack or heart damage."
[Id.]

[12]In an affidavit submitted by Angela Foster, she testifies although her mother saw Dr. Malek
with complaints of "'shortness of breath', she was annoyed with the same respiratory complaints for
which she had been seeing Dr. Crackower for years, and she wanted a second opinion." [Doc. 22-3, ¶ 6]
"She did not consider her condition, at the time of seeing Dr. Malek as a change in her prior medical
condition." [Id.]

[13]Neither the Trustee (Angela Foster), nor any other member of the Trust attended the lunch
meeting, and thus, the addendum contains no signature on behalf of the Trust, as owner of the policy.
[Doc. 22-2, ¶ 40; 29-1, ¶ 40]

-8-

¶ 28; 29-1, ¶ 28] On June 1, 2007, Mrs. Warren passed away from lung cancer; she was diagnosed

with lung cancer in 2006 - the year after delivery of the policy. [Docs. 22-2, ¶ 29; 29-1, ¶ 29] At the

time of her death, Mrs. Warren was 62 years old. [*See* Docs. 23-4, p.1; 22-2, ¶ 29] United received

notice of Mrs. Warren's death on or about July 1, 2007. [Docs. 22-, ¶ 30; 29-1, ¶ 30] Almost one year

later, plaintiffs received correspondence from United, stating in pertinent part as follows:

> This letter is to inform you of the decision we have made concerning your clients' claim for benefits on Eleanor F. Warren's life insurance policy. We have carefully reviewed and evaluated the information received from our claim investigation.

> Please note that before a life insurance policy is issued, an application for insurance must be completed. Relying on the answers given, the Company then determines if the applicant is eligible for coverage. On the application dated October 15, 2005 . . . Ms. Warren affirmed that all answers were true and complete to the best of her knowledge and would be relied on to determine insurability.

> When the policy was delivered on December 7, 2005, a delivery receipt was signed by Ms. Warren. . . . The delivery receipt requires the insured to confirm there has been no change in health since the date of the application, have had no illness or injury, and have not consulted a health care provider or been hospitalized. Any incorrect or misleading information provided herein may void the policy from its effective date. Ms. Warren reaffirmed that there was no change from the date of the application and that she had not consulted a health care provider.

> Our routine claim investigation revealed that Ms. Warren consulted Dr. Crackower on October 27, 2005, during which she was prescribed three medications. In addition, Ms. Warren sought treatment by Dr. Richard Fei on October 31, 2005 and November 30, 2005. Dr. Fei's records indicated a patient history of a mild heart attack and emphysema treated by Dr. Steven Silas. These records also showed that she was prescribed an additional two medications plus oxygen. This information was not disclosed on the delivery receipt. Had we been made aware of her visits to Dr. Fei, his records would have been obtained as well as records from Dr. Silas.

> Based on the information we obtained, we would have declined the application for insurance and would not have issued the policy.[14] The contract, therefore, is being

---

[14]In response to a request to review the Trust's claim for insurance proceeds, Jerry Bender, United's Risk Selection Director, stated as follows: "Had we been aware of the history of COPD, emphysema, and interstitial lung disease, *we would have offered a rated policy at best, and possibly declined* depending uon [sic] the severity of the disease which we don't yet know." [Doc. 22-8, p.19

rescinded, which means it is considered to have never been in force, effective the issue date, and our refund of premiums paid is enclosed.  No claim is payable.

This decision is based on available information that was developed through our investigation process and was made only after careful consideration. . . .

[Doc. 22-14]

## Analysis

**1.      Defendant's Arguments regarding Material Misrepresentation and Condition Precedent**

In its memorandum, defendant sets forth its primary arguments as follows:

Specifically, United of Omaha contends that plaintiffs have no right to recover life insurance proceeds based upon on [sic] the fact that Eleanor Warren, the proposed insured, <u>failed to disclose on the date of the delivery of the policy</u>, that she had visited doctors she had never seen before and had received treatment from these doctors *because of a change in health* between the date of the application and the date of delivery.  Indeed, the day the policy was hand delivered to Ms. Warren she was asked: (a) if she had any illness or injury between the time of the application and the time of delivery; (b) if she had any illness or injury between the time of the application and the time of delivery; (c) if she had a change of health during that period of time.[15]  Ms. Warren answered "**No**," to each of these questions despite the fact that: (1) she had seen Drs. Fadi Malek and Richard Fei on October 31, 2005, November 3, 2005, and November 30, 2005, and was prescribed oxygen, a bronchial inhaler, and given pnneumococcal [sic] vaccinations on October 31, 2005 and November 3, 2005; AND (2) she saw Dr. Mounir, a cardiologist, for the first time the day before the delivery of the policy in question and he recommended an electrocardiogram, a carotid ultrasound

_____

(emphasis added)]

[15]The addendum actually reads, in pertinent part, as follows:

I/We certify that since the date of the application, all persons proposed for insurance (a) have had no change in health, (b) have had no illness or injury, and (c) have not consulted a health care provider or been hospitalized since the date of the application . . .

.

. . . Incorrect or misleading information provided herein may void this Policy from its effective date.

[Doc. 23-10]

-10-

and a calcium score.[16]

Had Ms. Warren truthfully answered the questions asked at the time of delivery, the policy would not have been delivered, no premium would have been accepted, and United of Omaha would have obtained the medical records and test results, and ultimately not issued the subject policy.[17] Ms. Warren failed to disclose

---

[16]The Court notes plaintiffs have submitted the affidavit of Dr. Malek (partner to Dr. Fei), who testifies in pertinent part as follows:

1.  As a medical doctor, specializing in pulmonary diseases, I saw Eleanor Faye Warren on October 31, 2005 and for a period thereafter. . . .

2.  Mrs. Warren came in with an *established diagnosis* of Chronic Obstructive Pulmonary Disease ("COPD"), as per her prior pulmonologist, Dr. Stephen L. Silas, who saw her from 1999 to 2001, and a long history of "upper respiratory infection", a term used continuously by her attending physician, Dr. Sydney Crackower.

3.  Mrs. Warren had been on Combivant and Flovent as prescribed by Dr. Silas for her COPD, but had stopped taking these because of side effects. I prescribed newer medications, Spiriva and Advair, *on the basis of this same COPD diagnosis, for the same exact treatment*, since these were newer medications with a reputation for less side effects.

4.  Mrs. Warren related her symptoms, that she had shortness of breath and wheezing, and that she had been having that for a while. This is typical of someone who has been diagnosed with COPD.

5.  As is commonly done with patients having a COPD history, I administered in October of 2005 a Pulmonary Function Test ("PFT") just like Dr. Silas had done in March of 1999 and in July of 2001. Based on recent review of the test results from Dr. Silas' records from my own records, *she actually showed improvement in the October, 2005 testing.*

    . . . .

7.  <u>Conclusion</u>: **When Mrs. Warren came to see me in late October and November, 2005, she did not have a change in health as it relates to her prior diagnosis of COPD, or related symptoms of shortness of breath, because when she came to see me she already had a long standing diagnosis of COPD dating back to Dr. Silas, from 1999/2001. In fact, she had even shown improvement in October of 2005 since being initially diagnosed by Dr. Silas.**

[Doc. 26-2, pp. 1-2(underlining in original; italics and bold added)] As previously noted, Dr. Mounir also testified his testing revealed no change in Mrs. Warren's heart health. [Doc. 26-5]

[17]Counsel's statement appears to be perhaps a bit speculative. As previously noted, in response to a request to review the Trust's claim for insurance proceeds, Jerry Bender, United's Risk Selection

> information, which was a "condition precedent" to the delivery of the policy. As such,
> this Honorable Court should declare the policy null and void as there was never a
> "meeting of the minds" to form a binding contract.

[Doc. 23-2, pp. 3-4 (underlining and bold in original; italics added)] From the foregoing, as well as

a review of defendant's brief, it appears defendant is arguing it is entitled to deny coverage because:

(1) Mrs. Warren made material misrepresentations in the application to United; and (2) "no delivery

of the policy ever occurred due to Ms. Warren's . . . failure to satisfy the condition precedent [*i.e.* the

affirmation contained in the addendum] to deliver the policy."

As to "material misrepresentation," that coverage defense can be defeated if plaintiffs are

successful in proving United waived that defense. *See e.g.* Bordelon v. National Life & Acc. Ins. Co.,

187 So. 112 (La.App. 1939)(where insurer is on notice a misrepresentation may have been made by

an insured in its application, the insurer may waive its defense of material misrepresentation by failure

to act upon or inquire into that information); Home Ins. Co. v. Matthews, 998 F.2d 305, 309-310 (5th

Cir. 1993)(quoting Comment, *Waiver and Estoppel in Louisiana Insurance Law*, 22 La.L.Rev. 202,

204 (1961)) ("It is clear that under Louisiana law, the 'acceptance of premium payments by an insurer

after receiving knowledge of facts creating a power of avoidance or privilege of forfeiture constitutes

a waiver of such power or privilege.'"); Swain for and on Behalf of Estate of Swain v. Life Ins. Co.

of Louisiana, 537 So.2d 1297, 1300 (La.App. 2 Cir. 1989). Accordingly, "material misrepresentation"

will be addressed in the section of this Ruling addressing "waiver," *infra.*

With regard to "condition precedent," defendant argues as follows:

> The life insurance policy at issue, could never become effective if not delivered
> by United of Omaha. A condition precedent for delivery was that Ms. Warren disclose
> the obvious change in her health or medical condition and the new doctors she had

---

Director, stated as follows: "Had we been aware of the history of COPD, enphysema, and interstial lung
disease, we would have offered a rated policy at best, and possibly declined depending uon [sic] the
severity of the disease which we don't yet know." [Doc. 22-8, p.19]

seen between the application date and delivery date.. [sic] Pursuant to basic contract law, United of Omaha was well within its rights to rescind the policy because, in effect, no delivery of the policy ever occurred due to Ms. Warren's own failure to disclose and her failure to satisfy the condition precedent to deliver the policy!

. . .

Under Louisiana law, "a suspensive condition is the civil law analog of a condition precedent." In re Myles, (Bkrtcy.M.D. La. 2008), 395 B.R. 599, 604. When an obligation is dependent upon a condition, "the right to enforce the obligation does not arise until fulfillment of the suspensive condition, and the obligation may not be enforced until the condition is met." Hampton v. Hampton, Inc., 97-1779 (La.App. 1 Cir. 1998), 713 So.2d 1185, 1190. "When it has become certain that the suspensive condition will not occur . . . the obligations are broken and the contract is null." Guichard v. Greenup, 259 So.2d 93, 94 (La.App. 1 Cir. 1972).

The delivery receipt signed by Ms. Warren on **December 7, 2005** was in fact a conditional receipt, which clearly stated

I/We understand that United of Omaha Life Insurance Company is relying upon the information set forth in this Addendum [delivery receipt] **and has made execution and delivery of this Addendum a condition of delivery of this Policy.** Incorrect or misleading information provided herein may void this Policy from its effective date. [Emphasis added]. (See Exhibit "H").

The foregoing language clearly provides that delivery of the policy in question was conditioned upon Ms. Warren giving a truthful and honest disclosure of her medical condition at the time of delivery. . . . Accordingly, the condition precedent was never fulfilled.

. . . .

. . . Ms. Warren's truthful disclosure of her medical condition, particularly with regard to the clear change in health, was a condition precedent for delivery. Based on Ms. Warren's failure to provide a truthful disclosure, plaintiffs are without any right to enforce their insurance claim against United of Omaha. Rather, because truthful disclosure was never made by Ms. Warren in order to effect delivery, and also because truthful disclosure would have necessarily made delivery impossible, Untied of Omaha rightly rescinded the policy and returned all premium payments.

[Doc. 23-2, pp. 13-15(emphasis in original)]

The only case upon which defendant relies in support of this position is <u>Holmes v. Jefferson Pilot Financial Insurance Company</u>, 907 So.2d 185 (La.App. 2 Cir. 2005). <u>Holmes</u> only addresses a "conditional receipt"; it does not address the other concept raised by defendant in the portion of his brief cited above, namely "condition precedent." Regardless, the Court finds defendant's reliance upon this case is misplaced. <u>Holmes</u> involved a situation in which the applicant was provided with a "binding" or "conditional receipt" upon submission of the application. <u>Holmes</u> at 186; *see also* 15 William Shelby McKenzie & H. Alston Johnson, <u>Louisiana Civil Law Treatise: Insurance Law and Practice</u> § 254 (3d ed. 2010).[18] In <u>Holmes</u>, the potential insured completed an application for a life insurance policy, paid his agent the first month's policy premium and signed a "conditional receipt," which set forth the following conditions: (1) the proposed insured must tender a minimum advance payment equal to one month's premium; (2) any medical examinations required by the company had to be completed and received by the insurer within 60 days of completion of the application; and (3) the proposed insured(s) had to be a risk insurable on the insurability date in accordance with the company's rules. <u>Id.</u> at 187.[19] The receipt further provided:

> [If] all conditions in this receipt have been fulfilled exactly, coverage under the policy applied for, subject to the amount limitations may begin on the insurability date, which is the latest of (a) the date of completion of Part I of the application, or (b) the date of completion of all medical examinations, tests and other evidence required by the company, or (c) the policy date, if any, requested in the application.

---

[18]A "binding receipt" application form "calls for the attachment of the insured's check for the first premium, and will usually specify that the policy is effective upon the date of the application and payment of the first premium subject to the condition that the applicant is subsequently determined to be insurable." Such an application "has the effect of keeping the insured 'on the hook' until the insurer determines whether to accept the risk." McKenzie & Johnson, *supra*; *see also* <u>Guidry v. Colonial Life and Acc. Ins. Co.</u>, 506 So.2d 219 (La.App. 5 Cir. 1987); <u>Welsh v. Paul Revere Life Ins. Co.</u>, 665 So.2d 142 (La.App. 4 Cir. 1995).

[19]The conditional receipt additionally provided, "If any person proposed for insurance dies by suicide or if the application or this receipt contains any material misrepresentations, then the company's liability under this receipt is limited to a refund of the premium paid." <u>Id.</u> at 187.

-14-

Shortly after completing the application, paying the first month's policy premium and receiving the conditional receipt, the applicant died without having undergone the required medical examination. After a trial, the district court found the conditional receipt was a contract subject to a suspensive condition, which could never be fulfilled due to the decedent's death prior to completion of the medical examination. Id. at 187. On appeal, the Louisiana Second Circuit stated the law, in pertinent part, as follows: "An application for insurance constitutes a contractual offer and the insurance contract is not completed until such application or offer is accepted by the insurer, particularly where the application reserves the insurer's right to reject the applicant's coverage." Id. at 189 (citing Kieffer v. Southern United Life Insurance Co., 437 So.2d 919 (La.App. 2d Cir.1983); Sanders v. Hartford Life Insurance Co., 350 So.2d 945 (La.App. 2d Cir.1977)). The court ultimately affirmed the trial court's Ruling.

By contrast, this matter does not involve a "binding receipt" or "conditional receipt" application.[20] Rather, in this matter, the application specifically states:

> In order for the policy to go into effect, (a) all policy delivery requirements must be completed and accepted by the Proposed Insured and Policyowner, and (b) there must be no change in either the health or habits of any Proposed Insured that would change the answers to any questions on the application prior to: (I) the date the application is approved for policy issued, or, if later (ii) the date the full initial premium is paid. The Proposed Insured or Applicant/Owner/Trustee shall immediately notify United of Omaha's Underwriting Department of any change of health or habits of any Proposed Insured that will change any statement or any answer to any question in the application.

[Doc. 1-3, p.23] Accordingly, in this matter, no contract was formed until the application was accepted by defendant. See e.g. Kieffer v. Southern United Life Ins. Co., 437 So.2d 919, 921 (La.App. 2 Cir.1983)("The Louisiana courts have often emphasized that an insurance certificate is not a binding

---

[20]It appears United perhaps provides (or provided) the option to create a "binding receipt" application; however, that option was not selected in this matter. [See Doc. 23-4, p.2 ("Amount Collected: $_____ (To the Producer: In order to collect money, the Premium Acceptance Guidelines and other requirements for a Temporary Life Insurance Agreement must be satisfied.")]

contract, but merely an application for coverage, and the issuance of such a certificate is not

tantamount to the perfection of a contract. Such an application constitutes merely a contractual offer,

and the insurance contract is not completed until such application or offer is accepted by the insurer

- particularly where the certificate (i.e., application) reserves the insurer's right to reject the applicant's

coverage.")(citations omitted); McKenzie & Johnson, *supra* ("Another type of application form will

specify that the applicant is not to send the amount of the first premium with the application, but

should do so only upon notice from the company that the insurance has been accepted. . . . Louisiana

courts have tended to treat such applications as offers that ripen into contracts only upon acceptance

by the company.)

To the extent defendant is arguing the addendum constitutes a "conditional receipt," he has

provided no support for his position. Furthermore, the addendum appears to be a "rider," as that term

is defined in the policy[21], and as such, the addendum constitutes a portion of the contract of

insurance.[22] To the extent defendant is arguing the addendum contained a "condition precedent" (*i.e.*

that "Ms. Warren giv[e] a truthful and honest disclosure of her medical condition at the time of

delivery"), that argument will be addressed in the portion of this Ruling addressing "waiver." *See* Tate

v. Charles Agullard Ins. & Real Estate, Inc., 508 So.2d 1371, 1372, 1373 (La. 1987)("The doctrine

of waiver is available to an insured in proving that the insurer waived a condition precedent to

coverage under the policy." Waiver of the condition precedent can be "tacit.")

---

[21]The policy defines a "rider" as "a policy provision added to this policy to expand or limit the benefits payable." [Doc. 1-3, p.7] Because the addendum changes the policy by increasing the face amount from $1,000,000 to $2,000,000, and the addendum states "the medical examination completed May 27, 2005 for Banner Ins Co is made part of this policy," the addendum appears to be a rider.

[22]The policy states, "The entire contract is this policy, any riders and the signed application. . . ." [Doc. 1-3, p. 7]

2.      **Waiver of Coverage Defenses Arising Out of the Original Application for Insurance**

In plaintiffs' memorandum, they first argue:

> To the extent United seeks to rescind or void the policy on the basis that the original application does not disclose Mrs. Warren's prior history for COPD, United has clearly waived that defense. The following facts are undisputed:
>
> 1.    After United received the Trust's application, it issued a request to MIB seeking any medical or insurance information on file with MIB relating to Mrs. Warren.
>
> 2.    In response to its request to MIB, and prior to issuing the policy to the Trust, United received a report indicating that Mrs. Warren had been treated or diagnosed with COPD sometime prior to August 2001.
>
> 3.    Following its receipt of the MIB report, United failed to perform a reasonable investigation regarding Mrs. Warren's diagnosis and/or treatment for COPD. Specifically, pursuant to the general rules of the MIB, member companies such as United are allowed to request from MIB the details regarding the coded information contained in a MIB report if they are unable to confirm the information through their own investigation. In this case, United did not request the coded information from MIB regarding Mrs. Warren.[23]
>
> 4.    If United had requested the coded information from MIB related to Mrs. Warren's COPD, it could have determined the physician who diagnosed the condition and/ or the date(s) of treatment.
>
> 5.    United issued the policy to the Trust (and it also received the premium for two years) with the knowledge that Mrs. Warren had a history of COPD, and the answer in the application regarding COPD was not true.

The Fifth Circuit's decision in *Home Insurance Company v. Matthews*, 998 F.2d 305 (5th Cir. 1993) sets forth the applicable law. . . . Writing for the court, Judge Wisdom began the analysis by stating:

> It is clear that under Louisiana law, the "acceptance of premium payments by an insurer after receiving knowledge of facts creating a power of avoidance or privilege of forfeiture constitutes a waiver of such power or privilege". This was the Louisiana law when it was

_____

[23]Defendant contests the first sentence of the above-quoted paragraph; the remainder appears to be uncontested.

written in 1961; it was the law when Justice Tate wrote that acceptance of premiums with knowledge will estop the insurer from denying coverage; and the Louisiana courts have recently reaffirmed this principle in *Swain v. Life Insurance Co. of Louisiana* repeating language quoted above. *Id.* at 309.

. . . .

In the instant case . . . the [MIB] report specifically informed the United underwriter that Mrs. Warren had a history of COPD, which is the same condition United now claims she failed to disclose in the application. Further, . . . the United underwriter had the ability to go directly to MIB to obtain the information regarding the COPD code, but chose not to.

In sum, United issued the policy to the Trust (and then received premiums for 2 years) with the full knowledge that (1) Mrs. Warren had a history of COPD, and (2) the answer on the application relating to lung disease was not true. Consequently, pursuant to *Home Insurance* and *Swain*, United waived its right to void the policy based on the misrepresentations contained in the application.

[Doc. 22-1, p.14-15, 18 (footnotes omitted)]

In response, defendant argues Mrs. Foster's failure to disclose her prior history and treatment for COPD to United is not the sole basis for denying coverage, arguing: After Mrs. Warren submitted the application to United, but before the policy was delivered to Mrs. Warren, "Eleanor Warren had a change in her medical condition, she saw three new physicians, she was prescribed medication, she was placed on oxygen for the first time in her life, and additional tests were ordered." [Doc. 29, p.13] Defendant notes when the policy was delivered, Mrs. Warren signed the addendum, which required her to affirm that since the date of the application, she: (a) had had no change in health, (b) had had no illness or injury, and (c) had not consulted a health care provider or been hospitalized. The addendum further states "Incorrect or misleading information provided herein may void this Policy from its effective date." [Id.] Defendant then distinguishes the cases cited by plaintiffs in support of their position, and concludes:

> In this case, Mr. Smith had no reason to suspect that Ms. Warren may not have been in sound health, and neither Brandon Smith nor United of Omaha could have initiated any further inquiry regarding Drs. Malek, Fei and Mounir, because Eleanor Warren never disclosed their identities. . . . Under no circumstances can it be said that United waived its "power or privilege to avoid coverage," given these facts and circumstances.

[Doc. 29, pp. 14-15]

Plaintiffs respond to this argument in their reply memorandum as follows:

> In this case, before United issued the policy, the MIB report specifically informed United that Mrs. Warren had a history of COPD, which is the same condition United now claims she failed to disclose in the application. Further, the United underwriter had the ability to obtain the information directly from MIB regarding the COPD code, but chose not to. If United had requested the coded information from MIB, it could have determined the physician who diagnosed the condition and the dates of treatment. Instead, United claims that it "investigated" the COPD by requesting medical records for the period of June 2005 through November 2005 from Dr. Crackower, and posing some generic questions to Mrs. Warren through Brandon Smith, and through a telephone interview in mid-November 2005. However, it is undisputed that no one ever asked Mrs. Warren's whether she had a history of COPD after United received the MIB report.

> Indeed, based on the rather extensive and exhaustive investigation that United did after Mrs. Warren's death in an effort to defeat the Trust's claim for benefits, we now know that the treatment for COPD referenced in the MIB report was with Dr. Steven Silas in 2000 and 2001.

[Doc. 35, pp.4-5]

The Louisiana jurisprudence describes the doctrine of "waiver" as follows:

> Waiver is generally understood to be the intentional relinquishment of a known right, power, or privilege. Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. A waiver may apply to any provision of an insurance contract, even though this may have the effect of bringing within coverage risks originally excluded or not covered.

> . . . In addition, notice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer, and failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered.

Steptore v. Masco Const. Co., Inc., 643 So.2d 1213, 1216 (La. 1994); *see also* Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371, 1373-74 (La. 1987); North American Specialty Insurance Company v. Debis Financial Services, Inc., 513 F.3d 466, 470 (5th Cir. 2007). "The party asserting waiver . . . must bear the burden of proof on the issue." Taita Chemical Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 388 (5th Cir. 2001)(citing Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371, 1375 (La. 1987)).

As stated by the Fifth Circuit:

> This court has held that if an insurer chooses to make an independent investigation of an applicant and if the circumstances are such that it is in a position to ascertain the facts by a reasonable search, then the insurance company cannot avoid liability by pleading reliance on the insured's application. Apperson v. United States, *supra*; New York Life Insurance Co. v. Strudel, 5 Cir. 1957, 243 F.2d 90. Since the defendant in this case conducted an independent investigation and 'ought to have known of the facts, or, with proper attention to its business, would have been apprised of them, it has no right to set up its ignorance as an excuse.' Knights of Pythias of the World v. Kalinski, 1896, 163 U.S. 289, 298, 16 S.Ct. 1047, 1051, 41 L.Ed. 163. These precedents do not hold that an insurance company has the right to armor itself with a collation of medical facts and then employ that armor as a defensive weapon when a claim is made upon it. Rather, they support our conviction that the defendant should be charged with knowledge of what appears in its own records.

Trawick v. Manhattan Life Insurance Company of New York, New York, 447 F.2d 1293, 1396 (5th Cir. 1971).[24] In a more recent case, The Home Insurance Company v. Matthews (a portion of which is cited in plaintiff's brief, as noted above), the Fifth Circuit stated as follows:

> It is clear that under Louisiana law, the "acceptance of premium payments by an insurer after receiving knowledge of facts creating a power of avoidance or privilege of forfeiture constitutes a waiver of such power or privilege." This was the Louisiana

---

[24]While this Court recognizes the applicable law in Trawick was that of the State of Mississippi, the cases relied upon by the Fifth Circuit in support of its position involve the application of Mississippi, Florida and federal law.  Furthermore, this Court has found nothing in the jurisprudence indicating the result would not be the same under the law of Louisiana, as it pertains to waiver.  *See e.g.* Steptore, *supra*, Eagan v. Metropolitan Life Ins. Co., 158 So. 575 (La. 1934); Bailey v. American Marine & General Ins. Co., 185 So.2d 214 (La. 1966); Swain for and on Behalf of Estate of Swain v. Life Ins. Co. of Louisiana, 537 So.2d 1297 (La.App. 2 Cir. 1989).

law when it was written in 1961; it was the law when Justice Tate wrote that acceptance of premiums with knowledge will estop the insurer from denying coverage; and the Louisiana courts have recently reaffirmed this principle in <u>Swain v. Life Insurance Co. of Louisiana</u> repeating language quoted above.

Swain purchased life insurance and represented on the policy that he was in "sound health". In fact, five years earlier Swain had triple by-pass surgery, three years earlier he was diagnosed as having Laennec's cirrhosis, and, three weeks before signing the policy, he had hip surgery. Although Swain was on crutches when he signed the policy, the agent never questioned Swain about his health. The acceptance of premiums when the agent had reason to suspect that Swain may not have been in sound health, yet did not initiate further inquiry, led the district court to hold that the insurance company waived any power or privilege it might have to avoid coverage based on Swain's representation.

<u>The Home Insurance Company v. Matthews</u>, 998 F.2d 305, 310 (5th Cir. 1993)(footnotes omitted)(citing <u>Swain for and on Behalf of Estate of Swain v. Life Ins. Co. of Louisiana</u>, 537 So.2d 1297 (La.App. 2 Cir. 1989)).

The Court finds, with regard to the original application for insurance, defendant waived its right to rescind the policy based upon misrepresentations contained in the original application. Defendant had a right to enforce the language contained in the application requiring the applicant's responses to be truthful[25], and defendant knew of that right as the drafter of the application; thus the first and second elements of "waiver" are satisfied.[26] Accordingly, the appropriate inquiry is whether:

---

[25]The application, like the addendum, contained the following language:

I, the undersigned, understand and agree that:

1    All answers in this application are true and complete and will be relied on by United of Omaha to determine insurability.  Any incorrect or misleading answers may void this application and any issued policy effective the issue date.

[Doc. 23-4, p.8]

[26]As noted earlier, the elements of waiver are as follows: (1) an existing legal right; (2) knowledge of the existence of that right; and (3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished.  <u>Steptore v. Masco Constr. Co.</u>, 643 So.2d 1213, 1216 (La. 1994).

(a) defendant had an actual intention to relinquish the requirement in the application that "incorrect or misleading answers may void this application," or (b) defendant's conduct was so inconsistent with the intent to enforce the application's requirement for accurate answers, so as to induce a reasonable belief that the right to enforce that language in the application has been relinquished. Steptore at 1216.

In the present case, it is undisputed defendant had in its files, prior to issuance of the policy, a report regarding Mrs. Warren's medical history from the MIB, and that report indicates Mrs. Warren had been treated or diagnosed with COPD sometime prior to August 2001. (The report further indicated Mrs. Warren underwent an EKG at Banner's request in August of 2005, and the results of the EKG were abnormal.) [Doc. 22-8, p. 4] However, defendant did not further question Mrs. Warren about COPD or any other lung impairment, nor did it further question her about any potential heart issues, nor did it require her to undergo a medical examination or any other additional testing as had Banner. Defendant was entitled to ask the MIB for further information after completing its own investigation"[27], which "typically" would result in obtaining the doctor's name who was the source of the information. [Id. at 6] However, in this matter, defendant did not ask the MIB for further information, even though their "Risk Selection Director," Jerry Bender, testified he "would have probably done that." [Id.; *see also* Id. at 7, 8]  In fact, in a memorandum attached to Mr. Bender's deposition, he is asked to review the claim, and is specifically asked: "Also, please state in your response what standard underwriting information was required in issuing this contract, (i.e. telephone inspection, paramedical exam, blood & urine, etc. etc.), as well as a description of the MIB codes, if obtained at underwriting." [Doc. 22-8, p.18] At the end of his response, Mr. Bender states as follows: "We did have an MIB code in file that should have caused the underwriter to have done a more

---

[27]Doc. 22-1, ¶ 16

thorough job of investigating her lung impairments, but that apparently was overlooked or ignored." [Id. at 19] When asked "what, if anything, did the underwriters do specifically to investigate the COPD MIB code," Mr. Bender testified the underwriter ordered medical records from two doctors[28] (which contained no record of COPD) and asked the agent to "go back and question the client for any other doctors that may have been seen." [Id. at 19] However, in the subsequent interview of Mrs. Warren by the agent, she was never asked whether or not she had ever suffered from COPD or any other lung impairment, nothwithstanding the MIB code indicating a potential history of COPD.  The closest the examiner came to broaching such a topic was when she asked whether or not Mrs. Warren smoked, or had ever been a smoker.  Mrs. Warren truthfully responded she had quit smoking approximately five years earlier.[29]  [Doc. 22-10, p.8]

Accordingly, when the policy issued, United was aware the answer placed in the form, to the question found in her application, denied any prior history of "*disease of the lungs or respiratory system*"[30], but United was fully aware the MIB information showed a COPD "code" for Mrs. Warren, at some point prior to August of 2001; that it had chosen not to confirm whether or not the code actually represented a "*disease* of the lungs or respiratory system," and had chosen not to request further information from the MIB (who had supplied the COPD code) to clarify the situation, and yet

---

[28]This appears to be an error, in that it seems the only doctor from whom updated medical records were requested was Dr. Crackower. [*See e.g.* Docs. 22-2, ¶ 19; 29-1, ¶ 19]

[29]It should be noted the United application posed the following question: "During the **last 10 years**, have you used . . . any form of tobacco?" [Doc. 23-4, p.4 (emphasis in original)] Brandon Smith checked the box stating "No" in response.  Mr. Smith's response was inconsistent with that provided by Mrs. Warren in the telephone interview, namely, that she had quit smoking "about five years ago." [Doc. 23-8, p. 8 (emphasis in original).]

[30]Doc. 23-4, p.3]

United elected to issue the policy and accept sizable payments.[31] Under these facts, the Court finds a reasonable insurance company would have inquired further than did United in this matter, and thus United's failure to conduct even the most cursory of a follow up investigation or genuine inquiry in the face of the MIB "code" constitutes a waiver of United's right to after the fact, rescind the policy based on possible inaccurate answers contained in an application. Steptore, at 1216 ("[N]otice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer, and failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered.") The Court additionally finds defendant's conduct to have been so inconsistent with any intent to enforce the language in the application which stated "incorrect or misleading answers may void this application," for this Court to find its conduct sufficient to induce a reasonable belief that United had relinquished its right to enforce that particular language in the application. Id. In other words, the Court finds defendant waived its right to enforce the referenced language in the application.

Additionally, as previously noted, *Mr. Smith* provided the answers contained in the United application, the telephone records do not support his contention he reviewed each of the responses with Mrs. Warren over the telephone, and Mrs. Warren was sent only those pages of the original application which required her signature. Louisiana courts hold "when the insurance company has prepared the policy and the application form, and the insured is asked to do nothing more than sign it, the insurer cannot avoid liability on grounds that the information contained in the application was

---

[31]The Court finds defendant's argument that it could not have obtained the pertinent medical information from "Drs. Malek, Fei and Mounir, because Eleanor Warren never disclosed their identities" to be unsupported in fact. As previously noted, after Mrs. Warren's death, United did indeed obtain the pertinent medical information through its "routine claim investigation" of "available information that was developed through [United's] investigation process." [Doc. 22-14 (correspondence from United to plaintiff's advising their claim for insurance proceeds was denied)]

not correct." Swain for and on Behalf of Estate of Swain v. Life Insurance Co. of Louisiana, 537 So.2d 1297, 1300 (La.App. 2 Cir. 1989); see also Hardy v. Commercial Standard Ins. Co., 134 So. 407 (La. 1931); Cloud v. Security General Life Ins. Co., 352 So.2d 406, 407, 408 (La.App. 3d Cir. 1977)(where application for insurance was filled out by agent, and thereafter presented to insured "with the suggestion that he 'sign here and here and here,'" and insurers only evidence of an intent to deceive was its reliance on the certification that the application was accurate, there existed "no proof that the [insured] intentionally sought to deceive the insurer.")

**3.     The Addendum to the Application for Insurance and Intent to Deceive**

The Court additionally finds United is not entitled to rescind the policy based upon any misrepresentations contained in the addendum, as the Court finds defendant has not established the misrepresentations were made with the intent to deceive.  La. R.S. 22:860 provides as follows:

> A. Except as provided in Subsection B of this Section . . ., no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
>
> B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless either one of the following is true as to the applicant's statement:
>
> (1) The false statement was made with actual intent to deceive.
>
> (2) The false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer under the policy.

The Louisiana Supreme Court interprets this statute as requiring the insurer to prove "the applicant's false statements were made with the intent to deceive *and* that they materially affected the acceptance of the risk or the hazard assumed by the insurer." Johnson v. Occidental Life Ins. Co. of

California, 368 So.2d 1032, 1036 (La. 1979); *see also* Coleman v. Occidental Life Ins. Co. of North Carolina, 418 So.2d 645, 646 (La. 1982). "The burden of proof rests with the insurer." Coleman at 646. "'Strict proof of fraud is not required to show the applicant's intent to deceive, because of the inherent difficulties of proving one's intent.'" Johnson at 1036 (quoting Watson v. Life Ins. Co. of La., 335 So.2d 518 (La.App. 1st Cir. 1976)). Rather, "Intent to deceive must be determined from surrounding circumstances indicating the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality." Coleman at 647 (quoting Cousin v. Page, 372 So.2d 1231, 1233 (La. 1979)); *see also* Johnson at 1036.

In this matter, plaintiffs do not argue that the representations contained in the addendum were true, nor do they argue the misrepresentations did not materially affect the acceptance of the risk by United. Thus, the crucial question is whether or not there was an intent to deceive on the part of Mrs. Warren. The Court finds there was not. The addendum states in pertinent part as follows:

> I/We certify that since the date of the application, all persons proposed for insurance (a) have had no change in health, . . . and (c) have not consulted a health care provider or been hospitalized since the date of the application except for any examinations (medical, paramedical, laboratory) completed at the specific request of UNITED OF OMAHA LIFE INSURANCE COMPANY.

[Doc. 22-13] With regard to whether or not Mrs. Warren had a change in health, as illustrated by the MIB code, Mrs. Warren had suffered from the same respiratory *ailments* for a minimum of five years. Furthermore, Angela Foster (the Trustee and Mrs. Warren's daughter), Dr. Mounir and Dr. Malek all testified Mrs. Warren underwent *no change in health* between submission of the application for life insurance and execution of the addendum. [*See* footnotes 11, 12, and 16, *supra*; *see also* Docs. 22-3; 26-2; 26-5] Dr. Malek specifically testified Mrs. Warren had suffered with respiratory ailments, including COPD, for many years, and he did not consider her condition, at the time of seeing him, as

a change in her health.[32] [Id.] Angela Foster also testified Mrs. Warren had suffered with respiratory ailments for years, and did not consider her condition, at the time of seeing Dr. Malek, as a change in health.  Likewise, Dr. Mounir testified Mrs. Warren did not have a change in health during the relevant period. [Id.]

As to Mrs. Warren's failure to disclose her consultation with a health care provider (namely, Dr. Malek and Dr. Mounir) between submission of the application and execution of the addendum, the Court finds Mrs. Warren's failure to disclose did not arise out of an intent to deceive, nor do the circumstances create a reasonable assumption she recognized the materiality of her misrepresentation. Coleman at 67.  This Court, sitting as the trier of fact in this matter, finds the testimony of Brandon Smith regarding the events on the day the addendum was executed to be not entirely credible.  First, as previously discussed, with regard to the original application, Mr. Smith testified he filled out the United application by using information contained in the Banner application (the Banner application had been filled out by a paramed working for Banner and not by Mrs. Foster or Ms. Warren). Although Mr. Smith testified on re-direct that he did indeed review the answers he provided with Mrs. Warren over the telephone, his testimony was rather equivocal, and the telephone records do not support his assertion. [See Doc. 22-4, p.25]  Prior to submission of the application, Mrs. Warren was provided with only those pages of the application requiring her signature - she was not provided with the pages containing Mr. Smith's answers to the medical questions.  This practice appears to be in contradiction to United's policies and procedures.  [See Doc. 22-4, p.23] Moreover, the application contains more than one inaccuracy or misrepresentation by Mr. Smith.  The application poses four questions to the insurance agent, with the last asking: "In the presence of the Proposed Primary

---

[32]Arguably, Mrs. Warren did have a change in health *for the better*, as Dr. Malek testified her condition had improved since her treatment with Dr. Silas, which ended in 2001.

Insured/Spouse have you asked each question exactly as written and recorded the answers completely and accurately?" [Doc. 23-4, p.8] Mr. Smith's answer is "Yes." As shown above, Mr. Smith did not pose the application questions "in the presence" of Mrs. Warren, and the evidence does not support his testimony that he did so over the telephone. [*See also* Doc. 22-4, p.26 ("The only time [we met in person] was at the policy delivery.")] Additionally, Mr. Smith dated the application "10-15-05." However, Mrs. Foster testified it was impossible for Mr. Smith to have signed the application on October 15, 2005, as that was the date upon which she and Mrs. Warren signed the application and tendered it to Federal Express for delivery to Mr. Smith.[33] Finally, as previously noted, Mr. Smith provided an incorrect answer to the question regarding Mrs. Warren's smoking history.

Second, as to the day the addendum was executed, Mr. Smith testified he met Mrs. Warren for lunch to deliver the policy, and before signing the addendum, he and Mrs. Warren "went through every page of that policy," including the original application to United, which was bound within the policy. [Doc. 22-4, p.26] However, once again, when one reads the pages surrounding that particular testimony, the Court again finds Mr. Smith to be rather equivocal on this topic. [*See* Doc. 22-4, pp. 27-29]In sum, the Court, sitting in this matter as the trier of fact, finds Mr. Smith's testimony that he reviewed the every page of the entire insurance policy (much of which was written in rather technical

---

[33]Ms. Foster testified as follows:

> In early October of 2005 my mother and I received a cover letter from Jessica Breaux of the Smith Agency, forwarding the signature pages only, with no medical information, for a new application for a United of Omaha policy, which we signed on October 15, 2005 at my mother's house in Abbeville, Louisiana and returned to the Smith agency by Federal Express. Mr. Smith was not in our presence at that time in Abbeville, Louisiana, nor could he have signed that same form on the same date that we had signed, in spite of the affirmation stated above his signature on that form, indicating that he reviewed these matters in our presence and signed it on the same date, being October 15, 2005.

[Doc. 22-3, ¶ 4]

jargon) with Mrs. Warren (including those pages which had been "scratched out"), over a meeting in a public restaurant while eating lunch, to be questionable, particularly when the Court finds Mr. Smith to be neither the best historian, nor the most attentive to detail. [Id.]  As implied previously, this Court has grave concern as to whether or not Mr. Smith reviewed the original application with Mrs. Warren at all (in light of his equivocal testimony and telephone records that do not support his claim), which causes the Court to question whether he reviewed the addendum in a meaningful manner with Mrs. Warren over lunch, such that Mrs. Warren would have sufficiently understood the materiality of the questions and deliberately provided false or fraudulent information with the intent to deceive Mr. Smith and/or United.  By Mr. Smith's own account, Mrs. Warren had no involvement with the application documents (other than to provide her signature), and thus, the Court questions Mr. Smith's assertion she tediously and painstakingly reviewed the policy and addendum over their lunch meeting in a public restaurant.

Third, further questions arise as to credibility when one takes into consideration: (1) it was the Smiths' who suggested the Warrens find a replacement insurance policy[34] - the Warrens' did not seek a replacement for the uncontestable Northwestern policy which was in place and applicable - and presumably the Smiths' motivation was to earn a monetary commission; and additionally (2) prior to his deposition, Mr. Smith was informed by United that should United lose this lawsuit, United intended to sue Mr. Smith and hold him personally liable for United's loss, which caused him concern.[35]

---

[34]The only reason provided for the Smiths' suggestion and offer to find a replacement policy was that it was a "sales pitch" utilized by Brandon Smith's father.  Thus, presumably, the motivation was to earn a commission on the sale of the policy.

[35]The Court notes at his deposition, Mr. Smith testified after this lawsuit was filed, United sent him correspondence stating "they're [sic] was gonna be a lawsuit," "should Mutual of Omaha lose the case, [Mr. Smith] will be held personally liable," and "that [he] needed to contact [his] E & O carrier."

Fourth, as previously noted, prior to applying for life insurance with United, Mrs. Warren had an **uncontestable** policy with Northwestern Mutual and **had no intention of changing life insurers**. Rather, Mr. Smith and his father, who were meeting with George Warren about renewing the group medical coverage for BWB Controls (the Warren family business), made a "sales pitch" to Mr. Warren by advising they could likely find a policy for Mrs. Warren with a lower premium. [Doc. 22-4, p.5] Angela Foster testified, "As Trustee of the Eleanor F. Warren Family Trust, and the owner and applicant on the United policy of Mrs. Warren's life, I would not have cancelled the previously issued and **uncontestable** Northwestern Mutual policy for One Million ($1,000,000.00) Dollars on her life without being assured of the issuance of a valid replacement policy from United. [Doc. 22-3, ¶ 11(emphasis added)] Additionally, after United had approved coverage for Mrs. Warren for $1,000,000, it was Mr. Smith's father who suggested increasing coverage to $2,000,000, as part of his "sales approach." [Doc. 22-4, p.16]

Of further import to this Court's determination regarding "intent to deceive" is the fact that when directly asked specific questions during her telephone interview, Mrs. Warren responded truthfully. However, as previously noted, the interview was conducted in a very poor manner, which questions whether it, indeed was designed to obtain information necessary to United's determination of whether or not it wished to accept the risk of insuring the life of Mrs. Warren.[36]

---

[Doc. 22-4, pp. 20, 21] He further testified: "I don't wanna be sued, you know. Over this. It looks like we already are. But that was my concern." [Id. at 21]

[36]For example, during the interview the following exchange took place:

A.     And the name of your doctor if you have a prescription.
B.     Dr. Sidney Crackower.
A.     Ok.
B.     And, oh, he's in Lafayette, I recall seeing that somewhere.
A.     Uh-huh. I mean all of the information is probably the same as I took the insurance out.
B.     Ok. And what is your height and weight?

Due to the foregoing, the Court finds there was no "intent to deceive" on the part of Mrs.

Warren.

**4.    Statutory Penalties**

La. R.S. 22:1811 provides as follows:

All death claims arising under policies of insurance issued or delivered within this state shall be settled by the insurer within sixty days after the date of receipt of due proof of death, and if the insurer fails to do so without just cause, the amount due shall bear interest at the rate of eight percent per annum from date of receipt of due proof of death by the insurer until paid.

It is undisputed United received proof of Mrs. Warren's death on or before July 1, 2007.

Plaintiff argues as follows:

In Louisiana, when an insurer chooses to deny coverage in reliance on a legal or factual defense which investigation would prove to be unsubstantial, the insurer will be liable for statutory penalties. *Swain*, 537 So.2d at 1307.

In this case, before it issued the policy, United had actual knowledge that the answer in the application relating to Mrs. Warren's history of COPD was not true, and United specifically knew that Mrs. Warren had been treated for COPD sometime prior to August 2001. Further, United knew that the representation in the "Addendum" by Mrs. Warren was not true, because it had Dr. Crackower's October 27, 2005 records. Finally, United intended for the trustee to sign the "Addendum", because it knew that the trustee's signature (or its "written consent") was required pursuant to La. R.S. 22:859. Therefore, United has been without just cause for over two years in not paying the Plaintiffs the benefits due under the policy. The penalty provided in La. R.S. 22:656 is clearly warranted.

[Doc. 22-1, p.27]

In response, defendant argues as follows:

Under no circumstances can an individual lie as many times as Eleanor Warren and expect an insurance company who was unaware of those lies, to be liable for attorneys' fees and penalties.  That is the classic *"piece de resistance."*

---

[Doc. 22-10, pp. 4-5]  It appears from the foregoing, either the interviewer changed the subject before Mrs. Warren completed her answer, or the interviewer should have asked "have you seen any doctors other than Dr. Crackower?", particularly when the application itself listed both Dr. Crackower and Dr. Eugene Steuben as Mrs. Warren's physicians.

   **Plaintiffs' moral of the story is, lie as many times as you can, hide as many of the facts as you can, and lie about new and pertinent information that you know the trier of fact and United was unaware of, so that you have the policy delivered, and then when the trier of fact or United of Omaha discovers those lies, seek penalties and attorneys' fees, because that simply furthers the goals which the plaintiffs seek to achieve.**

   It is incredible that plaintiffs can claim that United of Omaha "has been without just cause for over two years in not paying the benefits due under the policy," given the facts and circumstances of this case.

[Doc. 29, p. 21]

   While this Court notes defendant's response is more in the nature of inappropriate theater rather than legal argument, plaintiff's arguments fails to disclose the principle to which it cites and such failure is not without exception.  For example, this Court's very brief, independent research on this issue reveals the case of <u>Bertrand v. Protective Life Ins. Co.</u>, 419 So.2d 1254, 1259 -1260 (La.App. 3 Cir.,1982).  In <u>Bertrand</u> the Court held as follows:

   Protective Life claims that its investigation of plaintiff's claim under Bertrand's policy revealed enough evidence to sustain a defense of just cause for its failure to pay the claim within 60 days. We agree. Although we have found upon close examination that the alleged misrepresentations on the application for insurance were made unintentionally and did not materially affect the risk undertaken by the insurer, Protective Life was justified in believing it had found such reasons to refuse the claim after its investigation. The investigation uncovered substantial evidence that Bertrand may have had diabetes, hypertension, and a problem with alcohol which he failed to reveal in his application. As we have noted, these problems were not serious, but the medical evidence to that effect was confusing. Furthermore, Protective Life uncovered evidence of Bertrand's hospitalizations but was unable to clearly determine the reasons for these stays. We have concluded that these were voluntary treatments to "dry out", that is, to combat alcoholism. These hospitalizations did not materially affect the risk assumed by the insurer because Bertrand's alcoholism was under control at the time the policy was issued, but Protective Life could not have determined this easily as the hospital records apparently do not reflect the reasons for Bertrand's stays.

   An insurer's refusal to pay can be found to be not "without just cause" even though its defense is not subsequently upheld in court. <u>Ducote v. Life Insurance Company of Louisiana</u>, 245 So.2d 531 (La.App. 3rd Cir. 1971); and <u>Hendricks v. Connecticut General Life Insurance Company</u>, 244 So.2d 249 (La.App. 3rd Cir. 1971).

-32-

Protective Life had just cause to believe that Bertrand intended to omit from his application information which may have caused the application to be rejected. Furthermore, the fact that the application did not disclose this information cannot be attributed to Protective Life's agent. Therefore, we will amend the trial court's ruling to deny the assessment of penalties against Protective Life.

Id. at 1259-1260; *see also* Sandifer v. Louisiana Life Ins. Co., 64 So.2d 488 (La.App. 1 Cir. 1953).

First, the Court finds the facts of Bertrand to be more similar than the facts of Swain to the facts before this Court. Furthermore, in light of plaintiffs' failure to sufficiently discuss the applicable jurisprudence, or identify any binding authority on this topic, the Court finds plaintiffs have failed to carry their burden to establish they are due the relief requested and therefore, are not entitled to statutory penalties pursuant to La. R.S. 22:1811.

## Conclusion

For the foregoing reasons, the Court finds in favor of plaintiffs on their claim for insurance proceeds, and finds in favor of defendant on plaintiff's claim for statutory penalties. Pursuant to Fed. R. Civ. P. 54(d)(1), defendant shall bear all court costs arising out of this proceeding.

The parties are hereby ORDERED to jointly submit a final judgment, approved as to form, in accordance with the foregoing, within thirty days of issuance of this Ruling.

THUS DONE AND SIGNED in Chambers, this _____ date of September, 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE